UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

ALBERT WILLIAMS,                                    :

                    Petitioner,           :          **REPORT AND**
                                          **RECOMMENDATION**
         -against-               :          **TO THE HONORABLE**
                                            **KIMBA M. WOOD**

WILLIAM PHILLIPS, Superintendent       :
of Green Haven Correctional Facility,              03 Civ. 3319 (KMW)(FM)
                                     :
                   Respondent.
--------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.   <u>Introduction</u>

          Pro se petitioner Albert Williams ("Williams") brings this habeas corpus

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction,

following a jury trial in Supreme Court, New York County, on one count each of Rape

and Sodomy in the First Degree.  On September 14, 1993, Justice Richard D. Carruthers,

before whom the case was tried, sentenced Williams, as a persistent violent felony

offender, to concurrent indeterminate terms of imprisonment of twenty-five years to life.

          Williams' amended petition advanced two claims:  that his speedy trial

rights were violated and that he was denied the effective assistance of appellate counsel.

He subsequently withdrew his speedy trial claim.  Accordingly, only Williams'

ineffective assistance claim is before the Court.  As set forth below, that claim is

meritless.  Accordingly, the petition should be denied.  Additionally, Williams should be

denied a certificate of appealability because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

II.    Relevant Facts and Procedural History

    A.    Pretrial Hearing

    On July 13, 1993, Justice Carruthers held a combined Huntley/ Wade hearing to address the voluntariness of Williams' confession and the suggestiveness of a prearrest lineup.[1]  Detective Robert J. Fox ("Detective Fox"), of the Manhattan Special Victim Squad, was the sole witness.  His testimony established as follows:

    On September 21, 1991, Detective Fox was assigned to investigate a rape which allegedly had taken place the day before.  The victim[2] reported that she had been raped by a person named "Jay Williams" in an apartment on the fourteenth floor of 215 East 96th Street, in Manhattan.  (H. 5, 6, 8).[3]

---

[1]    See People v. Huntley, 15 N.Y.2d 72 (1965); United States v. Wade, 388 U.S. 218 (1967).

[2]    To preserve the privacy of the victim, I have not referred to her by name in this Report and Recommendation.  In addition, the trial transcripts and the respondent's memorandum of law and declaration in opposition to the petition have been filed under seal. (See Docket No. 7).

[3]    "H." refers to the transcript of the pretrial hearing.  "T." refers to the trial transcript.  "S." refers to the sentencing transcript.  "Ex." refers to the exhibits annexed to the Declaration of Luke Martland, Assistant Attorney General of the State of New York, dated October 27, 2003.

Several months later, on January 8, 1992, Detective Fox went to 215 East 96th Street with Detective Patricia Schiller ("Detective Schiller") and the victim.  (Id. at 6).  While the victim waited in a "fire escape hallway," Detectives Fox and Schiller went to apartment 14A to interview its occupant, Rebecca Oliver ("Oliver").   (Id. at 6, 21).  Oliver told Detective Fox that she was the only tenant, but had a boyfriend, Albert Williams, who would visit her and at times would stay overnight.  (Id. at 7).  At Detective Fox's request, Oliver called Williams, who agreed to meet Detective Fox at the apartment.  (Id.).  The victim then returned home.  (Id. at 24).

Later that night, the detectives spoke with Williams at Oliver's apartment. (Id. at 25).  Detective Fox asked Williams if he had a brother named Jay Williams.  (Id. at 8).  Williams confirmed that he did.  (Id.).  Detective Fox then asked Williams "if he would be willing to come to [his] office to speak with [him]."  (Id. at 8).  Although neither detective told Williams that he was required to comply, he agreed to do so.  (Id. at 8, 42).

At the precinct, the detectives questioned Williams for approximately thirty minutes.  (Id. at 10).  During this time, Williams told them that he did not commit the rape and was not in Oliver's apartment when it occurred.  (Id. at 9).  He further indicated that he did not know the victim and could not determine his exact whereabouts on the date she was raped because he had been unemployed during that month.  (Id.).  When Detective Fox asked whether Williams ever brought other women to Oliver's apartment, he

responded that he did not enter her apartment, or even go to her neighborhood, unless she was there.  (Id.).

   During this initial round of questioning, both Detective Fox and Williams were calm.  (Id. at 12).  Indeed, Detective Fox specifically told Williams (who was not handcuffed) that "he was not under arrest and . . . was free to go."  (Id. at 10, 29).  As Detective Fox explained, Williams "wasn't even a suspect" at the time.  Instead, the detectives were "looking into his brother Jay."  (Id. at 11).

   After questioning Williams, Detective Fox called the victim and asked her to describe her attacker once again.  Detective Fox then returned to the interview room and asked Williams to describe his brother Jay.  The victim's physical description of her assailant matched Williams, but was inconsistent with Williams' description of his brother.  Detective Fox then asked Williams to participate in a lineup to "clear the matter up," and Williams agreed.  (Id. at 11-12).  Williams' demeanor at the time was "very calm," and he stated that "[h]e just wanted to get it over with and prove his innocence." (Id. at 12).

   The lineup was conducted less than two hours after the detectives first met with Williams at Oliver's apartment.  After the victim identified Williams "almost immediately," Detective Fox arrested him and read him his <u>Miranda</u> rights.  (Id. at 16). Detective Fox testified that he did not administer those warnings earlier because Williams was not then a suspect.  (Id. at 18).

4

Following the arrest, Detective Fox recovered a set of keys from Williams'

pocket.  (Id. at 17).  Williams stated that none of the keys was for Oliver's apartment.

(Id. at 17-18).  Later that day, however, Detective Fox returned to Oliver's apartment and

confirmed that the keys did, in fact, fit the locks on her door.  (Id. at 18).

Ruling from the bench, Justice Carruthers found, insofar as relevant, that

Williams was not in custody prior to the lineup, and, therefore, was not entitled to

Miranda warnings.  (Id. at 59).  As the Justice explained:

> The test of whether someone is in custody, according
> to the Court of Appeals in People against [Yukl], is what a
> reasonable person not guilty of any offense would conclude.
> And based on the evidence before me I find that a person not
> guilty of any offense would have concluded certainly before
> the line up, that is, that he was not in custody.

(Id.).  Justice Carruthers therefore denied Williams' motion to suppress his pre-Miranda

statements.  (See id. at 60).

B.  Trial

The trial commenced the following day.

1.  People's Case

Not surprisingly, the People's principal witness at trial was the victim.  Her

testimony would have permitted a reasonable juror to find as follows:

On Friday, September 20, 1991, at approximately 2:30 p.m., Williams said

"hello" to the victim on Third Avenue near 93rd Street even though he did not know her.

(See T. 86-87).  The victim returned the greeting and rushed into a bank on the corner to

deposit a check before the bank closed.  (Id.).  Williams followed the victim into the bank and joined up with her again after she had finished her transaction.  (Id. at 88-89).  On the street, as the victim was walking up Third Avenue, Williams struck up a conversation with her.  (Id. at 89).  When they reached Third Avenue and 96th Street, Williams pointed out a building where a friend of his who was a doctor allegedly lived.  (Id. at 91).  Williams claimed that, as a favor for his friend, he waiting for an interior decorator to arrive.  (Id. at 92-93).  Standing outside the building, Williams told the victim that he recently had obtained a doctoral degree in psychology from New York University and was working with homeless people and the mentally disturbed at Metropolitan Hospital.  (Id. at 93).  He also said that he was a lecturer at Hunter College.  (Id. at 94).  The victim was "impressed" and "did not think he was trying to pick [her] up."  (Id.).

Williams invited the victim to wait with him in his friend's apartment until the interior decorator arrived.  At first, the victim declined, but she was curious about the apartment.  Her concerns were further allayed by the fact that the doorman recognized Williams.  (Id. at 95-99).  She therefore agreed to go with Williams, who led her to an apartment on the fourteenth floor.  There, he took out "a bunch of keys" and unlocked the door, observing that "sometimes the keys stick."  (Id. at 101).

Shortly after they sat down inside the apartment, the victim asked Williams to remove a kitten from the living room because she was afraid of cats.  (Id. at 104-05).  At one point during their conversation, Williams tore a sheet of paper from a Hunter College notebook in the apartment and exchanged telephone numbers with the victim.

(Id. at 107).  Williams falsely wrote on the paper that his name was "Jay."  (Id.).

Williams also asked the victim if she had a boyfriend.  (Id.).  She responded that she did

not, and inquired about Williams' "background, regarding women."  (Id. at 108).

Williams explained that he once had a long distance affair with a woman in London, but

added that "you couldn't just do anything you wanted to do to a woman in London

because of the laws," a response that the victim found "strange."  (Id.).  She started to

think that her decision to accompany Williams to the apartment may have been a

"mistake."  (Id.).

       After describing two of his other relationships, Williams asked the victim

whether she wanted to have sex on the living room floor.  (Id.).  The victim declined,

telling Williams that she did not like to have sex with people she did not know.  (Id.

at 109).  Williams then offered to come over to the victim's home on weekends and bring

food.  (Id.).  The victim again declined, explaining that she did not wish to have people

around her son in such circumstances.  (Id.).  At this point, the victim "started getting

scared."  (Id.).

       After Williams suggested that they have sex in the bedroom, the victim told

him that she was ready to leave.  (Id. at 109-10).  Williams then went into the kitchen for

a moment.  When he returned, Williams told the victim that she could go.  (Id. at 112-13).

As the victim walked toward the front door, Williams suddenly "grabbed [her] around

[her] the neck and . . . choked [her] and pushed [her] up against the wall" as he demanded

sex.  (Id. at 113).  As this was occurring, Williams had a knife in his hand.  (Id.).  The

victim asked Williams if he was going to use the knife, and he responded that it was "up to [her]."  (<u>Id.</u>).

   With his hand still around the victim's neck, Williams led her into the bedroom.  (<u>Id.</u> at 114).  Fearing that he would use the knife, the victim decided to submit to his demands, which began with a direction to perform oral sex.  She then asked him to use a condom, which he did.  (<u>See</u> <u>id.</u> at 115, 117).  After directing the victim to get on the bed, Williams began to have vaginal intercourse with her.  (<u>Id.</u>).  Williams also expressed an interest in anal sex, but the victim refused, and he did not press the issue. (<u>Id.</u> at 120).  Noting that the victim was menstruating, Williams began to take off the condom.  (<u>Id.</u> at 118).  The victim asked Williams not to do so, however, because she did not use birth control and was afraid of getting pregnant.  (<u>Id.</u>).  Despite this request, Williams had unprotected vaginal intercourse with the victim, telling her not to worry. (<u>Id.</u>).  Eventually, he withdrew and ejaculated.  (<u>Id.</u>).

   After they dressed, the victim saw the knife in Williams' back pocket.  He told the victim that everything that he had stated about himself was a lie, and that he did not know whose apartment they were in.  He also told her that there were "five guys waiting downstairs," who could come up if she wished.  After the victim declined, Williams took her wallet.  (<u>Id.</u> at 121).

   With the knife still in his back pocket, Williams escorted the victim out of the building.  (<u>Id.</u> at 124-25).  Once they were on the street, Williams began to walk away from her.  (<u>Id.</u> at 126).  Williams indicated that he intended to retain her wallet and began

examining its contents.  (Id.).  When the victim asked Williams what he was looking for,

he responded that he wanted her Medicaid card.  (Id.).  Hoping to identify the rapist, the

victim asked Williams to call her in two weeks to "tell [her] why he did that to [her]."

(Id. at 127, 129).  When he asked if she really wanted him to call, the victim responded

that she did.  (Id.).  Williams then returned the victim's wallet and walked away.  (Id.).

Immediately thereafter, the victim picked up her son from school and took

him to a restaurant on 72nd Street and Third Avenue.  (Id. at 129-30).  From there, she

called "911" to ask where to report that she had been raped.  (Id. at 131).  After she

provided the location of the incident, the operator told her to report the rape to the 19th

Precinct.  (Id.).

When she returned home, the victim called the 19th Precinct, which offered

to send an ambulance.  The victim declined because no one was available to watch her

son.  When she indicated that she lived across the street from the 23rd Precinct, she was

advised to call there.  In a subsequent call, someone at that precinct told her that she could

go to the hospital the next day.  (Id. at 132).

The next morning, the victim went to the emergency room at Metropolitan

Hospital.  (Id. at 134).  There, a doctor conducted an internal exam, and gave the victim a

pregnancy test, an HIV test, and a venereal disease shot.  (Id. at 135).

The victim's testimony was corroborated by the testimony of her friend,

Erwin Godette ("Godette"), who testified that on the date of the incident, at

approximately 9 p.m., the victim had called him and was "crying" and "upset."  During

the ensuing conversation, the victim told Godette that "she had been raped at knife-point" and feared that her attacker may have followed her home.  (Id. at 73-74, 77).

The People also called Oliver, the tenant of the apartment where the rape occurred, who testified that she dated Williams from January 1991 to January 1992.  (Id. at 207).  Oliver stated that she never gave Williams the keys to her apartment, but that he nevertheless had access to them.  (Id.).  She noted further that in September 1991 the key to her apartment "was not turning properly" because something was wrong with the lock.  (Id. at 209).  Oliver also identified the set of keys that Williams had on the date of his arrest, explaining that the key chain had been given to her by her sister.  (Id. at 233).

Oliver testified further about a Friday in September 1991, when she noticed that her bed had been made by the time she returned home, which was not its condition earlier that day when she left.  (Id. at 210-11).  She also confirmed that she had both a kitten and a Hunter College notebook in her apartment.  (Id. at 215-16).  Finally, Oliver stated that she had noticed, in October 1991, that several condoms were missing from her apartment.  She believed that Williams had taken them.  (Id. at 218, 227-28).

Just before the People rested, the victim's medical records were received into evidence.  (Id. at 281-82; see also id. at 287 (defense counsel's remarks in summation acknowledging that the medical records were "the last thing that was just put into evidence")).

2.    Defense Case

The defense did not present a case.

3.    Verdict and Sentencing

After brief deliberations, the jury found Williams guilty of Rape in the First Degree and Sodomy in the First Degree.  (Id. at 367).  Thereafter, on September 14, 1993, Justice Carruthers sentenced Williams, as a persistent violent felony offender, to concurrent indeterminate terms of imprisonment of twenty-five years to life.[4]  (S. 7, 19).

C.    Direct Appeal

The only claim raised on Williams' direct appeal was that he was denied a speedy trial in violation of Section 30.30 of the New York Criminal Procedure Law ("CPL").  (Ex. B).  On December 7, 2000, the Appellate Division, First Department, rejected that claim, holding that the adjournments resulting from his requests for DNA testing and the need to transcribe the minutes of pretrial proceedings could not be charged against the People.  People v. Williams, 717 N.Y.S.2d 170, 171 (1st Dep't 2000). Thereafter, by letter dated January 4, 2001, Williams sought leave to appeal.  (Ex. E).  On February 23, 2001, Associate Judge Victoria A. Graffeo of the Court of Appeals denied that application.  (Ex. F).

---

[4]    The predicate felony statement cited a 1978 conviction for Rape in the First Degree and a 1981 conviction for Sodomy in the First Degree.  (S. 5).  Williams also had two juvenile adjudications involving sexual contact with minors.  (Id.).

11

D.    Writ of Error Coram Nobis

On or about April 29, 2002, Williams applied pro se for a writ of error coram nobis on the ground that he had been denied effective assistance of appellate counsel.  In his application, Williams contended that his appellate counsel failed to incorporate into his brief claims that:  (1) the statements he made before being given Miranda warnings should have been suppressed; (2) he was improperly denied counsel during the lineup; (3) he was denied due process because he was convicted without corroborating medical evidence; (4) he was unfairly prejudiced by the "bolstering" hearsay testimony of Godette; and (5) the keys should not have been received as evidence because there was a break in the chain of custody and the testimony concerning them therefore was "fruit of a poisonous tree."  (Ex. G).

On March 6, 2003, the Appellate Division, First Department, denied Williams' coram nobis application.  (Ex. I).

E.    Habeas Petition

Williams commenced this proceeding by submitting his pro se petition to the Pro Se Office of this Court on March 31, 2003.  (See Docket No. 1).  Prior to then, the pendency of Williams' coram nobis application had tolled the running of the statute of limitations for nearly one year.  See 28 U.S.C. § 2244(d)(2); Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000).  Accordingly, as the respondent concedes, Williams' habeas petition is timely.  (See Resp't's Mem. at 11).

In his original petition, Williams claimed that he was denied his right to a speedy trial and that his appellate counsel was ineffective for various reasons.  (See Docket No. 1).  The respondent's memorandum of law and exhibits, together with the trial transcripts, were filed under seal on October 28, 2003.  (Docket Nos. 9-11).  In his papers, the respondent argued that Williams had not exhausted his ineffective assistance claim because he could have sought leave to appeal to the Court of Appeals from the denial of a writ of error <u>coram nobis</u>, but failed to do so.[5]  (Resp't's Mem. at 12, 14-16).  Thereafter, by letter dated January 2, 2004, Williams requested an extension of at least ninety days to exhaust that claim.  On January 12, 2004, I denied that request without prejudice to its renewal if the Court of Appeals granted Williams' request for leave to appeal out of time.  (Docket No. 13).

On February 12, 2004, the Court of Appeals granted Williams a <u>nunc pro tunc</u> extension of the time to appeal pursuant to CPL § 460.20.  <u>People v. Williams</u>, 1 N.Y.3d 622 (2004).  Thereafter, on May 12, 2004, Chief Judge Kaye denied Williams' application for leave to appeal from the denial of his <u>coram nobis</u> application.  (Am. Pet. ¶ 12(d)(7)).

On October 18, 2004, Williams filed an amended petition which repeated his prior claim, but also reflected the denial of leave to appeal from the denial of his

---

[5]      As of November 1, 2002, the New York law was changed to permit a state criminal defendant to seek leave to appeal from the denial of <u>coram nobis</u> relief when a petitioner claimed that appellate counsel was ineffective.  <u>See</u> <u>Paul v. Conway</u>, No. 04 Civ. 9493 (SHS), 2005 WL 2779435, at *1 (S.D.N.Y. Oct. 25, 2005).  The Appellate Division denied Williams' application a few months later.

coram nobis application.  Thereafter, Williams submitted reply papers, dated December 19, 2005, which stated that he was withdrawing his speedy trial claim.  (Docket No. 16 ("Reply") at 7).  Accordingly, his sole remaining claim is that he was denied the effective assistance of appellate counsel.

III.    Discussion

A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated.  See Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit has noted, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong.  Id. at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Stinson, 229 F.3d. at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

15

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  <u>Williams</u>, 529 U.S. at 389.

B.    <u>Ineffective Assistance of Appellate Counsel</u>

To prevail on an ineffective assistance of counsel claim, a criminal defendant must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984).  The <u>Strickland</u> standard applies not only to trial counsel, but also to an attorney handling a defendant's appeal as of right.  <u>Evitts v. Lucey</u>, 469 U.S. 387, 395-96 (1985); <u>Aparicio v. Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001).  However, in preparing a brief, appellate counsel is not required to raise every claim arising out of a trial and has the discretion to eliminate weaker ones. <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54 (1983); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) ("counsel does not have a duty to advance every nonfrivolous argument that could be made").  Furthermore, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 689.

To satisfy the first prong of the <u>Strickland</u> standard, Williams must show that appellate counsel did something more than omit a nonfrivolous argument that Williams wished to pursue.  <u>See</u> <u>Jones</u>, 463 U.S. at 753-54; <u>Aparicio</u>, 269 F.3d at 95.  He must establish that counsel opted not to raise "significant and obvious issues while

16

pursuing issues that were clearly and significantly weaker."  <u>Mayo</u>, 13 F.3d at 533; <u>Bragg</u>

<u>v. Kuhlman</u>, No. 97 Civ. 3025 (SHS), 1998 WL 867245, at *3 (S.D.N.Y. Dec. 14, 1998)

(citing <u>Benn v. Stinson</u>, 917 F. Supp. 202, 206 (S.D.N.Y. 1995)).

   Williams does not complain that his appellate counsel's decision to

challenge his conviction on speedy trial grounds was misguided.  Rather, he argues that

his appellate counsel also should have raised five other grounds for reversal.  As set forth

below, because none of these additional grounds is meritorious, Williams' appellate

counsel was not ineffective for failing to raise them.

     1. <u>Pre-Miranda Statements</u>

   In his reply papers, Williams contends that his appellate counsel was

ineffective for failing to argue that the statements that he made prior to being read his

<u>Miranda</u> rights should have been suppressed.  (Reply at 9).  Williams alleges that this

claim was meritorious because Justice Carruthers applied the incorrect legal standard to

determine whether he was "in custody" for Fifth Amendment purposes and misjudged the

facts.  (Ex. G at 10; Reply at 9-12).

   Ruling from the bench at the close of the pretrial hearing, Justice Carruthers

stated that "[t]he test for whether someone is in custody . . . is what a reasonable person

<u>not guilty of any offense</u> would conclude."  (H. 59) (emphasis added).  In framing the

issue in this manner, the Justice paraphrased the holding in <u>People v. Yukl</u>, which

actually refers to "what a reasonable man, <u>innocent of any crime</u>, would have thought had

he been in the defendant's position."  <u>People v. Yukl</u>, 25 N.Y.2d 585, 589 (1969)

17

(emphasis added); see also Hicks v. United States, 382 F.2d 158, 161 (D.C. Cir. 1967)

(quoting United States v. McKethan, 247 F. Supp. 324, 328 (D.D.C. 1965)) (applying

same standard).  There is, of course, a difference between the two formulations because a

defendant need not actually be innocent in order to be found not guilty in circumstances

where the prosecution fails to meet its burden of proof.  See, e.g., Kansas v. Marsh, 126

S. Ct. 2516, 2518 n.7 (2006).  Here, however, Williams had not been charged with any

crime when he arrived at the precinct.  Accordingly, the subtle distinction that he seeks to

rely upon, viewed in context, is essentially meaningless.  Moreover, it is apparent that

Justice Carruthers would have reached the same result had the issue been reframed in the

manner that Williams suggests.  Simply put, a reasonable person innocent of any crime

would not have considered himself to be under arrest merely because he was asked to

accompany police officers to a station house and, once there, was asked questions

intended to rule him out as a rape suspect.  See Oregon v. Mathiason, 429 U.S. 492, 495

(1977).  Indeed, such an innocent person would undoubtedly not have considered himself

to be under arrest even after he was asked to participate in a lineup.

       Williams' assertion that Justice Carruthers misjudged the facts regarding his

statements is based upon an extensive factual recitation in his reply memorandum.  For

example, Williams claims that he "never was told that [he] was free to go if [he] did not

wish to speak" and that he therefore "felt compelled to stay until [the detectives] were

through."  (Reply at 3).  However, such unsworn statements, proffered years after his

conviction, cannot be considered on habeas review.  Instead, the correctness of Justice

Carruthers' factual findings regarding the admissibility of Williams' statements must be determined on the basis of the record below, 28 U.S.C. § 2254(d)(2), which consists solely of Detective Fox's testimony.  Since that testimony was not contradicted during the hearing, Williams cannot possibly overcome the statutory presumption that Justice Carruthers' factual findings were correct.

There consequently is no legal or factual basis for Williams' contention that his appellate counsel was ineffective because he failed to press the argument that Williams' <u>Miranda</u> rights were violated.

### 2.    Right to Counsel During Lineup

Williams also contends that his appellate counsel should have advanced a claim that Williams "had the right to have an attorney present at the line-up."  (Ex. G at 10).  It is established law that the Sixth Amendment right to counsel first arises when judicial criminal proceedings are commenced.  <u>Kirby v. Illinois</u>, 406 U.S. 682, 689-90 (1972).  As a consequence, there is no right to counsel during a pre-indictment investigatory lineup.  <u>In re Grand Jury Subpoena Served Upon Doe</u>, 781 F.2d 238, 258 (2d Cir. 1985) (citing <u>Kirby</u>).  In this case, because Williams had yet to be indicted or charged with a crime, he clearly did not have a Sixth Amendment right to counsel before his post-lineup arrest.

The New York Constitution, which is more protective of a criminal defendant's right to counsel than the federal Constitution, affords a defendant the right to counsel before the commencement of formal proceedings in two narrow circumstances:

(a) "when counsel has actually entered the matter under investigation;" or (b) "when a defendant in custody, already represented by counsel on an unrelated case, invokes the right by requesting his attorney."  People v. Mitchell, 2 N.Y.3d 272, 274 (2004).  As the uncontradicted testimony at the pretrial hearing establishes, neither of these exceptions was applicable here.  (See H. 10, 12).

Accordingly, because Williams was not entitled to counsel during the lineup under either state or federal law, his appellate counsel cannot be faulted for failing to incorporate this claim into his brief on appeal.[6]

3.     Medical Evidence

Williams next contends that his appellate counsel "failed to place before [the Appellate Division] crucial evidence that could have resulted in a reversal of conviction" – namely, the records of the victim's medical examination the day after the rape – and that the jury therefore "was unaware that there was non-corroborating medical evidence for a crime to even have been perpetrated."  (Ex. G at 12-13).

Under New York law, "medical corroboration is not required to support a conviction for rape by forcible compulsion."  People v. Arhin, 609 N.Y.S.2d 604, 605 (1st Dep't 1994) (citing People v. King, 556 N.Y.S.2d 166 (2nd Dep't 1990)).  In any event, contrary to Williams' assertion, it is clear that the medical records were received in

---

[6]     Moreover, even if Williams were able to show that the lineup evidence should have been suppressed, the error plainly would have been harmless because Williams' theory of defense was that the victim had consented to having intercourse with him.  (See T. 293-94).  If so, one would expect the victim to be able to pick him out of a lineup a few months later.

evidence during the trial.  (See T. 281-82, 287).  Indeed, Williams' trial counsel argued in

summation on the basis of those records that the victim

> went to the hospital the next day and she was examined.
>
> Now she claims that my client . . . choked her,
> squeezed her neck hard.  And not only did he choke her in the
> beginning and pinned [sic] her against the wall, but led her
> into the bedroom with his hands around her throat.
>
> There is not a bit of evidence to support that in the
> medical records and no bruising . . . .
>
> You'll see in the medical records, if you can read it,
> that it says that her neck was supple, non-tender and there was
> no swelling . . . . Not only don't the medical records support
> her theory, but they contradict it in a very material way.

(T. 287-88).

The law does not require an appellate attorney to advance an argument,

such as Williams' medical records claim, that clearly is wrong. Accordingly, this branch

of Williams' ineffectiveness claim does not entitle him to any relief.

4.      Godette's Testimony

Williams also contends that his appellate counsel "failed to bring to [the

Appellate Division's] attention that [Williams] was prejudiced at trial by the bolstering

testimony of a long and dear friend of [the victim], Mr. Godette."  (Ex. G at 13).  As he

explains, "Mr. Godette was neither present at the time and place of the alleged incident,

and since he can only present 'hearsay' testimony, was not a credible witness for the

corroboration of the alleged incident."  (Id.).

21

New York law provides that "evidence that a victim of sexual assault promptly complained about the incident is admissible to corroborate the allegation that an assault took place." People v. McDaniel, 81 N.Y.2d 10, 16 (1993).  The rationale behind this "prompt outcry" exception to the hearsay rule is that "some jurors would inevitably doubt the veracity of a victim who failed to promptly complain of a sexual assault, such conduct being 'natural' for an 'outraged female.'"  Id. (quoting People v. Rice, 75 N.Y.2d 929, 931 (1990)).  For the exception to apply, the complaint must have been made promptly after the crime.  Additionally, the proof must be limited to the fact that the complaint was made without any accompanying details.  Id. at 17.

Here, both of these requirements appear to have been met.  Godette testified that the victim called him at approximately 9 p.m., only a few hours after the rape was alleged to have occurred.  (T. 73-74).  Godette's testimony also was restricted to the victim's statement that she had been raped at knife-point.  (Id.).  He did not testify about any other details regarding the rape.  See People v. Terrence, 612 N.Y.S.2d 571, 572-73 (1st Dep't 1994) (prompt outcry testimony that victim "had been beaten and verbally abused in addition to having been sodomized and raped . . . . cannot reasonably be viewed as exceeding an allowable level [of detail]").

Furthermore, even if one were to assume that Godette's reference to the rapist's use of a knife constituted impermissible detail, the Appellate Division likely would have found such error harmless.  To establish the crimes of first degree rape and sodomy, the People had to prove that the acts alleged involved the use of "forcible

compulsion," which the New York Penal Law defines as either the "use of physical force" or a "threat which places a person in fear of immediate death or physical injury." N.Y. Penal Law §§ 130.00, 130.35, 130.50.  Consequently, if the jury believed that a rape – rather than consensual sex – had occurred, it undoubtedly would have convicted Williams even if there had been no testimony at all about a knife, because the victim testified (without contradiction) that she was "choked . . . and pushed . . . up against a wall" in the living room and then was led into the bedroom while Williams had "his hand around [her] neck."  (T. 113-14).  These acts alone were sufficient to establish that Williams used forcible compulsion.

Finally, even if Godette's testimony concerning a knife could be considered pivotal, Williams' trial counsel failed to object to the question that led to its introduction and did not seek to have the testimony stricken despite ample opportunity to do so.  (See T. 74).  Accordingly, had Williams' appellate counsel raised this issue, the Appellate Division would likely have refused to consider it because it was unpreserved.  See CPL § 470.05(2) (McKinney 2001).

In these circumstances, Williams cannot show, as he must, that his "bolstering" claim was obvious and significantly more likely to result in the reversal of his conviction than the speedy trial issue that his appellate counsel chose to raise.

### 5.   Chain of Custody of the Keys

Williams' last ineffective assistance claim, relating to the chain of custody of the keys recovered from him during his arrest, is frivolous.  (Ex. G at 15).  Williams

23

bases this claim on the fact that the Property Clerk's invoice for the keys (which is not part of the record) allegedly states that the "property was removed from 215 East 96th St apt 14a after consent for a search."

Here again, the claim that Williams alleges should have been raised on appeal was not preserved because Williams' trial counsel did not object to the receipt of the keys into evidence.  (T. 56).  Additionally, even on Williams' consensual sex theory of the case, it is apparent that Williams would have had to gain entry into Oliver's apartment somehow for the sexual activity to have occurred.  Whether this was accomplished through the use of keys or the door was unlocked was wholly irrelevant to the narrow question before the jury, which was what took place once Williams and the victim were inside the apartment.

Williams therefore is not entitled to the issuance of a writ simply because there may have been an issue regarding the location where the keys were found.

IV.   <u>Conclusion</u>

For the foregoing reasons, Williams' petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Williams should be denied a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.

V.    Notice of Procedure for Filing of Objections
      to this Report and Recommendation

         The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Kimba M. Wood and the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Wood. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:    New York, New York
          June 1, 2007


                                    FRANK MAAS
                         United States Magistrate Judge


25

Copies to:

Hon. Kimba M. Wood
United States District Judge

Albert Williams
DIN 93-A-7592
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

Alyson Gill, Esq.
Assistant Attorney General
Office of the Attorney General
  of the State of New York
120 Broadway
New York, New York 10271